## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| MARK WAYNE RAMSEY | : | No. 19-268 |

## MEMORANDUM

PRATTER, J.                                                    FEBRUARY _25_, 2022

The standard to overturn a conviction for lack of evidence is extraordinarily high. The defendant in this case, Mark Wayne Ramsey, moves to overturn a jury's verdict finding him guilty of two counts of securities fraud and one count of conspiracy to commit securities fraud. Although Mr. Ramsey makes interesting and, in some regards, compelling arguments, he has not met the high burden required of him. Thus, the Court denies his motion for judgment of acquittal.

### BACKGROUND

In the fall and winter of 2014, Mychal Kendricks (then a linebacker for the Philadelphia Eagles), Mr. Ramsey (his friend and roommate), and Damilare Sonoiki (an analyst at Goldman Sachs) traded stocks and options in Mr. Kendricks's brokerage account based on Mr. Sonoiki's insider information. Mr. Sonoiki, living and working in New York City, would communicate his insider information to Mr. Kendricks and/or Mr. Ramsey, then living together in Philadelphia, via text messages, cell phone calls, or FaceTime communications. Mr. Ramsey and/or Mr. Kendricks, and on one occasion Mr. Sonoiki, would then use money Mr. Kendricks had deposited into his brokerage account to execute trades based on Mr. Sonoiki's insider information. Mr. Kendricks's account grossed approximately $1,198,075 from these trades.

In an Information against Mr. Kendricks and Mr. Sonoiki in 2018, the United States charged both men with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. §§ 240.10b-5 and 240.10b5-2. Both men waived their right to grand jury indictments and pled guilty. As part of their plea agreements with the Government, both men agreed to cooperate with the Government as witnesses.

In 2019, a grand jury returned an Indictment against Mr. Ramsey based on the same events. The Indictment charged Mr. Ramsey with ten counts. It alleged that Mr. Ramsey conspired to commit securities fraud in violation of 18 U.S.C. § 371 (Count One) and that Mr. Ramsey committed securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. §§ 240.10b-5 and 240.10b5-2 in transactions involving securities of four different companies (Counts Two–Five). As pertinent to Mr. Ramsey's present motion, the indictment also alleged that Mr. Ramsey conspired to commit securities fraud in violation of 18 U.S.C. § 1349 (Count Six) and that Mr. Ramsey committed securities fraud in violation of 18 U.S.C. § 1348 in the same transactions of securities of the same four companies (Counts Seven–Ten). Mr. Ramsey proceeded to trial.

After an eight-day trial, a jury convicted Mr. Ramsey of Counts One, Four, Five, Six, Nine, and Ten. Specific to Mr. Ramsey's motion here, the jury found Mr. Ramsey guilty of conspiracy to commit securities fraud in violation of 18 U.S.C. § 1349 (Count Six), securities fraud in violation of 18 U.S.C. § 1348 as to Sapient Corporation (Count Nine), and securities fraud in violation of 18 U.S.C. § 1348 as to Oplink Communications, LLC (Count Ten). Mr. Ramsey now moves for a judgment of acquittal as to these counts. He does not contest the guilty verdict as to Counts One, Four, or Five. The Court recounts the facts of the case introduced at trial most pertinent to Mr. Ramsey's motion.

## I.     Mr. Kendricks's and Mr. Sonoiki's Involvement

The Government called both Mr. Kendricks and Mr. Sonoiki to testify as part of their plea deals. Both witnesses described the formation of the scheme to trade in Mr. Kendricks's brokerage account with Mr. Kendricks's money based on Mr. Sonoiki's insider information.

Mr. Sonoiki worked at Goldman Sachs as an investment banking analyst in the technology, media, and telecom group. Sep. 21, 2021 Tr. at 94:23–95:25.[1] Goldman often advised companies during an acquisition, which is when one company purchases another company. *Id.* at 96:10–19. Like many employees, Mr. Sonoiki had access to nonpublic information about these acquisitions. *Id.* at 96:20–97:3. Goldman had internal policies restricting employee trading based on confidential information and preventing employees from sharing confidential information with anyone outside their specific team. *Id.* at 29:20–22, 30:10–21, 97:17–98:24.

Mr. Sonoiki and Mr. Kendricks first met at a 2013 New Year's Eve party in Los Angeles. *Id.* at 100:10–18 (Mr. Sonoiki); Sep. 22, 2021 Tr. 77:24–78:6 (Mr. Kendricks). They exchanged phone numbers that night and subsequently stayed in touch. Sep. 21, 2021 Tr. at 101:3–8 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 78:7–9, 78:15–19 (Mr. Kendricks). At some point, Mr. Sonoiki told Mr. Kendricks that he worked at Goldman Sachs. Sep. 21, 2021 Tr. at 101:9–15. They then met in person in New York City in May 2014. *Id.* at 101:16–22 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 79:10–18 (Mr. Kendricks). They discussed Mr. Kendricks's interest in the financial markets and Mr. Sonoiki's ability to disclose insider information acquired at Goldman Sachs. Sep. 21, 2021 Tr. at 102:3–9, 102:12–103:12 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 79:19–80:16 (Mr. Kendricks). According to Mr. Sonoiki, Mr. Kendricks was interested in more than general investment advice

---

[1] For purposes of this memorandum, the Court's citations to the transcripts of the trial, other than the testimony of Peter Melley, will be to the rough version of the transcripts. If necessary, the Court will issue an amended memorandum with updated citations once the final transcripts are available.

and wanted information about "stuff for certain." Sep. 21, 2021 Tr. at 103:5–12. Mr. Kendricks confirmed that he knew this arrangement was illegal. Sep. 22, 2021 Tr. at 81:5–6. For himself, Mr. Sonoiki was interested in getting "a cut" and perhaps becoming Mr. Kendricks's "finance guy." Sep. 21, 2021 Tr. at 102:16–23.

As Mr. Kendricks testified, he informed Mr. Ramsey about his meeting with Mr. Sonoiki in New York as soon as he returned. Sep. 22, 2021 Tr. at 90:2–9. The two discussed the need to keep this plan quiet because trading on insider information was illegal. *Id.* at 90:15–25. Mr. Ramsey immediately wanted to be involved, Mr. Kendricks said. *Id.* at 92:3–9. Mr. Kendricks and Mr. Ramsey planned to use the money made from the insider trading to start up additional businesses. *Id.* at 105:3–8.

At first, Mr. Sonoiki says, he was "noncommittal" about giving insider information because he knew doing so was illegal. Sep. 21, 2021 Tr. at 103:20–21. Around July 2014, however, Mr. Sonoiki changed his mind and told Mr. Kendricks he was willing to share insider information. *Id.* at 103:22–25, 104:3–4. On the afternoon of July 14, 2014, Mr. Sonoiki texted Mr. Kendricks that he "[g]ot something for [them]," meaning he had information about a deal that had not yet been publicly announced. Gov. Ex. 14-1; Sep. 21, 2021 Tr. at 107:22–108:4 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 82:11–25 (Mr. Kendricks).

Mr. Kendricks and Mr. Sonoiki then planned to speak about their plan in person on July 18, 2014, at a nightclub in York, Pennsylvania where Mr. Kendricks was making an appearance. Sep. 21, 2021 Tr. at 104:5–15 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 83:7–17 (Mr. Kendricks). According to Mr. Sonoiki, Mr. Kendricks chose the club setting because he knew it would be loud so that others would not overhear their conversations about insider trading. Sep. 22, 2021 Tr. at 22:5–19. Because Mr. Sonoiki missed his train, Mr. Kendricks paid for a private car to drive Mr.

Sonoiki from New York City to the club in York, Pennsylvania. Sep. 21, 2021 Tr. at 104:16–106:9 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 83:18–84:14 (Mr. Kendricks).

At the club, the two men discussed options, specifically call options and the brokerage service available through the Charles Schwab online platform called "OptionsXpress." Sep. 21, 2021 Tr. at 110:1–6 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 84:24–85:8 (Mr. Kendricks). Mr. Sonoiki explained how he could acquire insider information at Goldman and then share that information with Mr. Kendricks. Sep. 21, 2021 Tr. at 114:11–17. Shortly after this meeting, Mr. Kendricks returned to Philadelphia and opened an OptionsXpress account in which to trade options; Mr. Sonoiki helped him open the account. Sep. 21, 2021 Tr. at 111:18–7, 112:14–24 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 85:9–12, 86:10–12 (Mr. Kendricks). Mr. Kendricks initially deposited $80,000 in this account. Sep. 22, 2021 Tr. at 86:21–25.

## II.   Mr. Ramsey's Involvement

Mr. Ramsey was a high school friend of Mr. Kendricks. Sep. 22, 2021 Tr. at 75:3–4. Sometime in either the summer of 2013 or 2014, Mr. Ramsey moved into Mr. Kendricks's apartment in Philadelphia while Mr. Kendricks played for the Philadelphia Eagles. *Id.* at 75:17–22, 76:2–6. Mr. Ramsey paid no rent and Mr. Kendricks covered all expenses. *Id.* at 77:17–21. According to Mr. Kendricks, he and Mr. Ramsey discussed potential business opportunities and even opened a few with money that Mr. Kendricks supplied. *Id.* at 76:16–77:6. Mr. Ramsey also performed other tasks for Mr. Kendricks while he was busy with the Eagles. *Id.* at 77:10–16.

According to Mr. Kendricks, Mr. Ramsey had the password to his OptionsXpress account from the moment he created the account. *Id.* at 92:15–17, 23–24, 105:25–106:4. Mr. Kendricks gave him this access, he said, both because he did not understand the technology and because he did not have enough time. *Id.* at 93:11–16. To make trades within the account, Mr. Kendricks also had to enter a PIN number that would be texted to him; thus, Mr. Kendricks also gave Mr. Ramsey

access to his laptop computer because it received Mr. Kendricks's text messages via iMessage. *Id.* at 106:5–13. On multiple occasions when that did not work, Mr. Ramsey would, Mr. Kendricks says, call him or text him to get his PIN. *Id.* at 106:17–19, 107:18–108:4, 114:1–4, 114:14–24, 115:12–14, 115:20–25; Gov. Exs. 15-2, 15-5, 15-27.

Mr. Sonoiki confirmed Mr. Ramsey's role in the insider trading. He noted that they first met at a Philadelphia Eagles game sometime in 2014. Sep. 21, 2021 Tr. at 128:3–8. Mr. Sonoiki later learned that Mr. Ramsey lived with Mr. Kendricks. *Id.* at 128:20–23. Mr. Sonoiki recalled that, at least a first, Mr. Kendricks did not include Mr. Ramsey in their discussions about insider trading, but that later Mr. Kendricks told Mr. Sonoiki to speak directly with Mr. Ramsey about the trades moving forward. *Id.* at 129:4–12.

Mr. Sonoiki and Mr. Kendricks started the insider trading in the late summer of 2014. At that time, Mr. Sonoiki accessed Mr. Kendricks's account from New York to place trades for call options in Compuware. Sep. 21, 2021 Tr. at 118:3–9, 120:3–7, 121:4–8. After he made those trades, the account was flagged for unauthorized access. *Id.* at 121:9–16; *accord* Sep. 22, 2021 Tr. at 110:4–9. Mr. Kendricks called Charles Schwab to unlock the account. Gov. Ex. 2-4. As he did so, Mr. Ramsey was next to him. Sep. 22, 2021 Tr. at 111:3–14. Prior to calling Charles Schwab, Mr. Kendricks and Mr. Ramsey agreed that Mr. Kendricks would lie and say that nobody else had access to the account so that Charles Schwab would unfreeze it. Sep. 22, 2021 Tr. at 112:9–13, 113:7–12.

After the first successful insider trading in Compuware, Mr. Kendricks became nervous that they might get caught and so decided to put a barrier in between himself and Mr. Sonoiki. Sep. 22, 2021 Tr. at 116:11–25. According to Mr. Kendricks, Mr. Ramsey had the idea to talk directly with Mr. Sonoiki so as to shield Mr. Kendricks's involvement. *Id.* at 117:1–6. Mr. Kendricks then

texted Mr. Ramsey saying, "[d]elegation has been passed on to you." Gov. Ex. 15-4; Sep. 22, 2021 Tr. at 118:5–10. According to Mr. Kendricks, from that point on, Mr. Ramsey had primary contact with Mr. Sonoiki. Sep. 22, 2021 Tr. at 119:8–11. Mr. Sonoiki understood both that Mr. Ramsey was to be his primary contact and that he could call Mr. Ramsey and Mr. Ramsey would place the order for the trade. Sep. 21, 2021 Tr. at 129:11–12, 129:24–130:2. This was also convenient, he explained, because Mr. Ramsey lived with Mr. Kendricks, so Mr. Kendricks's OptionsXpress account would not be flagged for unauthorized access to the account. *Id.* at 130:2–7.

According to Mr. Sonoiki, Mr. Ramsey knew that he worked at Goldman Sachs and understood that the information he passed along was insider information. *Id.* at 130:10–131:5. Confirming this, Mr. Ramsey sought out Mr. Sonoiki to get advice about a "sure thing," which Mr. Sonoiki understood to mean trades based on his inside information. *Id.* at 134:22–135:11. They communicated, he said, by phone calls, text messages, and FaceTime. *Id.* at 131:10–11.

On his end, Mr. Kendricks testified that Mr. Ramsey helped him to manage the money. For example, Mr. Ramsey had the idea to deposit an additional $80,000 into the account to trade with and make money off Mr. Sonoiki's advice without alerting Mr. Sonoiki; apparently, Mr. Ramsey thought they could make more money without needing to pay Mr. Sonoiki. Sep. 22, 2021 Tr. at 109:6–16. In addition, Mr. Ramsey helped to pay Mr. Sonoiki. In September, Mr. Kendricks paid Mr. Sonoiki approximately $6,000 when he visited Mr. Kendricks's apartment; Mr. Ramsey was in a different room of the apartment. Sep. 21, 2021 Tr. at 150:6–20. Then, with Mr. Ramsey present, Mr. Sonoiki received $4,000 to $5,000 in cash outside of Philadelphia's 30th Street Station. Sep. 21, 2021 Tr. at 170:4–20 (Mr. Sonoiki); Sep. 22, 2021 Tr. at 126:1–14 (Mr. Kendricks).

For his efforts, Mr. Kendricks paid Mr. Ramsey $15,000. Sep. 22, 2021 Tr. at 126:21–25. He wired the $15,000 to Mr. Ramsey's former girlfriend's bank account to cover a loan she had given Mr. Ramsey. *Id.* at 127:1–9, 128:17–129:2. Mr. Ramsey's former girlfriend confirmed this. Sep. 23, 2021 Tr. at 51:11–17.

### III.    The Insider Trading Scheme

Three witnesses—Mr. Sonoiki, Peter J. Melley of the Financial Industry Regulatory Authority (FINRA), and an employee of Charles Schwab—explained how options work.

An option is an "an investment contract" which "allows somebody to buy and sell . . . shares of an underlying company at a predetermined price before a particular date and a limited time frame." Sep. 23, 2021 Tr. of Peter J. Melley at 5:1–4 [hereinafter Sep. 23, 2021 Melley Tr.]. "[A]n option is a derivative of a financial instrument," and it gives the holder of the option "the right, but not the obligation, to either buy or sell a stock, a security at a given price." Sep. 21, 2021 Tr. at 110:8–10. That price, set by the terms of the option, is called a "strike price." *Id.* at 110:11. The option then expires on a specific date called the "expiration date." *Id.* at 110:12; *accord* Sep. 23, 2021 Melley Tr. at 5:7–14. There are two types of options: "put" and "call" options. Sep. 23 Melley Tr. at 5:22–6:4. A "call" option gives the holder of the option contract the right to *purchase* the shares of the underlying security at the strike price before the expiration date, while a "put" option gives the holder the right to *sell* the shares of the underlying security at the strike price before the expiration date. *Id.* at 5:7–6:4.

An option is not issued, owned, or controlled by the company whose stock is the subject of the option contract. Sep. 21, 2021 Tr. at 58:12–13; Sep. 23, 2021 Melley Tr. at 62:2–6. Nevertheless, an option's price is based, at least in part, on the price of the underlying security. *See, e.g.*, Sep. 23, 2021 Melley Tr. at 62:14–24; Sep. 21, 2021 Tr. at 58:20–24, 111:6–11.

As most relevant to this case, people make money on call options in two ways. First, if the strike price of the option is lower than the market price of the underlying security, the holder of the option makes money by "exercising" the option—buying the underlying shares at the lower strike price established in the option contract—and then immediately turning around and selling those shares at the higher market value. Sep. 23, 2021 Melley Tr. at 5:14–17; Sep. 21, 2021 Tr. at 111:9–11. Second, options contracts themselves are valuable and can be bought and sold, similar to the underlying security; thus, the holder of the option may choose to sell the option, rather than exercising it. Sep. 23, 2021 Melley Tr. at 5:18–21, 20:4–8, 64:13–18; Sep. 21, 2021 Tr. at 59:5–14. Under this second method, the holder of an option never holds the shares of the underlying security, even for a second. Sep. 23, 2021 Melley Tr. at 65:15–17. Either way, a person holding a call option is "hoping that the [underlying] stock price is going to go up." *Id.* at 6:9–13; Sep. 21, 2021 Tr. at 135:21–22.

Options trading is much riskier than trading in the underlying securities. The holder buys it with the risk that the price of the underlying security will not go up; if that happens, the call option is worthless and expires. Sep. 21, 2021 Tr. at 111:7–9, 147:19–21; Sep. 23, 2021 Melley Tr. at 64:2–6. On the other hand, options offer a much higher potential upside than trading in the underlying securities, offering potential investment returns of "300 or 400 or 500 or 600. . . percent." Sep. 21, 2021 Tr. at 110:19–20; *accord* Sep. 23, 2021 Melley Tr. at 6:14–25.

As Mr. Sonoiki testified, the three men used his inside information to capitalize on the high returns available with options trading. When one company purchases another company, the buying company offers a "premium" on the share price of the company being bought, called the "target company." Sep. 21, 2021 Tr. at 97:4–16, 108:12–20. Once that deal is announced publicly, the share price of the target company generally increases. *Id.* at 116:2–4. Thus, a person who knows

ahead of time that a company will be acquired and that a public announcement to that effect is forthcoming can predict that the stock price of the target company will increase. Mr. Sonoiki described this as "if there was a dog race and you knew which one was going to win before the race." *Id.* at 108:7–8; *accord* Sep. 23, 2021 Melley Tr. at 23:17–21.

## IV. Evidence of the Insider Trading

The Government alleged that Mr. Sonoiki, Mr. Kendricks, and Mr. Ramsey executed this scheme based on Mr. Sonoiki's inside information of four companies: (1) Compuware, (2) Move, Inc., (3) Sapient Corporation, and (4) Oplink Communications, LLC. Because Mr. Ramsey's motion here implicates only Sapient and Oplink, the Court will detail only the evidence regarding insider trading as to those two companies.

### A. Sapient Corporation

In mid-2014, Sapient Corporation was in the process of being bought by another company, Publicis, and Goldman Sachs's technology media and telecom group was advising on the acquisition. Sep. 21, 2021 Tr. at 34:16–23. Publicis publicly announced its acquisition of Sapient in November 2014. *Id.* at 35:8–12. Sapient was a publicly traded company required to file with the Securities Exchange Commission and with securities registered with the SEC. *Id.* at 34:24–35:4. Mr. Sonoiki had inside information about this deal, knew this information was valuable, and shared it with Mr. Ramsey via phone and text. *Id.* at 162:24–163:12, 164:5–9, 165:3–9.[2]

On October 6, 2014, Mr. Sonoiki texted Mr. Ramsey to tell him he was going to call him about Sapient. *Id.* at 165:10–20, 166:7–12; Gov. Ex. 15-10. Then, according to phone records,

---

[2] The Government called a Digital Forensics Examiner for the FBI, Mr. Moore, who testified that Mr. Ramsey's phone number ended in the four digits 0690. Sep. 21, 2021 Tr. at 76:2–5. Likewise, a Verizon employee testified that the number ending in the four digits 7519 was registered to Ann Sonoiki. *Id.* at 67:10–24; Gov. Ex. 7. Mr. Sonoiki confirmed this, testifying that Government Exhibit 7 was a copy of his phone bill in his mom's name and that the number ending in 7519 was his phone number. Sep. 21, 2021 Tr. at 139:20–140:8. He also testified that he recognized the number ending in 0690 as Mr. Ramsey's cell phone number. *Id.* at 140:9–18.

between October 6 and October 14, 2014, Mr. Sonoiki and Mr. Ramsey were in touch on multiple occasions. *See, e.g.*, Gov. Ex. 7 at USA-013952–USA-013956. Mr. Sonoiki testified that they discussed options on Sapient and that Mr. Sonoiki advised Mr. Ramsey about what to purchase. Sep. 21, 2021 Tr. at 167:5–168:25. During those same days, often soon after the phone calls, Mr. Kendricks's OptionsXpress account purchased and sold a variety of call options on Sapient Corporation stock as well as Sapient Corporation stock itself. Gov. Ex. 2-3; Sep. 23, 2021 Melley Tr. at 31:7–9, 44:8–46:5.

A few weeks later, on November 3, 2014, Publicis' acquisition of Sapient was made public. Sep. 23, 2021 Melley Tr. at 32:24–25, 47:8–9. On November 6, Mr. Ramsey and Mr. Sonoiki were in contact again. Gov. Ex. 7 at USA-013966; Sep. 23, 2021 Melley Tr. at 46:23–47:2. That same day, Mr. Kendricks's account sold almost $470,000 worth of Sapient options. Gov. Ex. 2-3; Sep. 23, 2021 Melley Tr. at 77:10–13. Based on the Sapient trading, Mr. Kendricks's account recorded $489,079 in profit. Sep. 23, 2021 Melley Tr. at 58:13–14.

### B. Oplink Communications, LLC

Around that same time, the technology media and telecom group within Goldman Sachs was also advising other companies, Molex and Koch Industries, that planned to acquire a company called Oplink Communications, LLC. Sep. 21, 2021 Tr. at 35:19–36:3. Molex and Koch Industries publicly announced that they were going to acquire Oplink in November 2014. *Id.* at 36:14–18. Oplink was a publicly traded company required to file with the Securities Exchange Commission and with securities registered with the SEC. *Id.* at 36:4–9. Mr. Sonoiki confirmed that he had inside information about this deal, knew this information was valuable, and communicated this information to Mr. Ramsey both via text messages and phone calls. *Id.* at 173:19–175:4, 176:2–19.

Specifically, Mr. Sonoiki texted Mr. Ramsey on October 17, 2014 to tell him they were missing out on "some important stuff." Gov. Ex. 15-5; Sep. 21, 2021 Tr. at 173:15–24. Then, according to cell phone records, between October 31 and November 17, 2014, Mr. Ramsey and Mr. Sonoiki were in touch multiple times. Gov. Ex. 7 at USA-013964, USA-013968–USA-013969, USA-013971. Mr. Sonoiki confirmed that they had discussed Oplink. Sep. 21, 2021 Tr. at 176:6–19. During those same days, often soon after the phone calls, Mr. Kendricks's OptionsXpress account purchased and sold a variety of call options on Oplink's stock.[3] Gov. Ex. 2-3.

On November 19th, Molex and Koch Industries announced that they were going to acquire Oplink Communications, LLC. Sep. 21, 2021 Tr. at 36:14–18; Sep. 23, 2021 Melley Tr. at 53:6–9. On November 21, Mr. Sonoiki and Mr. Ramsey were in touch again, and Mr. Kendricks's OptionsXpress account sold a number of Oplink options. Gov. Ex. 7 at USA-013972; Gov. Ex. 2-3. They were also in contact on November 23 and 24, 2014 and Mr. Kendricks's account sold more Oplink options on November 24. Gov. Ex. 7 at USA-013972–USA-013973; Gov. Ex. 2-3. In total, Mr. Kendricks's account sold 1,638 Oplink call options, generating $660,000 in proceeds. Sep. 23, 2021 Melley Tr. at 53:10–17. Based on the Oplink trading, Mr. Kendricks's account showed $351,872 in profit. *Id.* at 58:11–12.

## V.    Mr. Ramsey's Motions for Judgment of Acquittal

After the Government rested its case and Mr. Ramsey began the presentation of his case, Mr. Ramsey moved under Fed. R. Crim. P. 29(a) for a judgment of acquittal on Counts Six through Ten. The Court held this motion in abeyance until the charging conference the following day.

---

[3] According to Mr. Melley, more than three-quarters of all Oplink call options traded on November 13, 2014 came from Mr. Kendricks's account. Sep. 23, 2021 Melley Tr. at 55:14–56:1; Gov. Ex. 23-4. Similarly, 56% of all Oplink call options traded on November 17, 2014 came from Mr. Kendricks's account. Sep. 23, 2021 Melley Tr. at 56:21–25; Gov. Ex. 23-5.

There, both parties presented oral argument on the matter without filing any briefs. Mr. Ramsey argued that an option contract is not the "security of an issuer" under the meaning of that term in § 1348. Sep. 24, 2021 Tr. at 98:15–17, 99:1–2, 99:16–19. The Court denied Mr. Ramsey's motion, finding that the word "security" likely is understood to encompass options and, further, that "in connection with" a security necessarily meant something beyond merely the purchase or sale of a stock. *Id.* at 100:13–101:10.

After the jury found Mr. Ramsey guilty of Counts One, Four, Five, Six, Nine, and Ten, Mr. Ramsey again moved for judgment of acquittal under Fed. R. Crim. P. 29(c). With the benefit of time and briefing, both parties clarified the nature of their arguments. The Court heard oral argument on the motion on December 14, 2021 and also ordered, and subsequently received, supplemental briefing from the parties. The motion is now ripe for the Court's resolution.

### LEGAL STANDARD

Under Rule 29(c), "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. . . If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c).[4] A court analyzing such a motion must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence. *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001); *accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The court is required to "draw all reasonable inferences in favor of the jury verdict." *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996). And, when reviewing such a motion,

---

[4] Mr. Ramsey requested, and the Court granted, an extension of time for him to file post-trial motions. Doc. No. 149. Thus, while Fed. R. Crim. P. 29(c) requires a defendant to file such a motion within 14 days, Mr. Ramsey's filing beyond 14 days is of no moment.

"[c]ourts must be ever vigilant. . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Stated succinctly, "[a] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam) (quoting *Jackson*, 443 U.S. at 326)).

A defendant making a motion for judgment of acquittal must overcome an "extremely high" burden when challenging a jury verdict based on the sufficiency of the evidence. *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (quoting *United States v. Lore*, 430 F.3d 190, 203 (3d Cir. 2005)). In other words, a court's "finding of insufficiency should 'be confined to cases where the prosecution's failure is clear.'" *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)).

## DISCUSSION

The Court begins with the text of 18 U.S.C. § 1348, the statute under which Mr. Ramsey was convicted. Section 1348 makes it a crime:

> (1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)); or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)).

14

To show securities fraud, the Government "need only prove one of § 1348's two subsections." *United States v. Hatfield*, 724 F. Supp. 2d 321, 324 (E.D.N.Y. 2010); *accord United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012). Each subsection has slightly different elements.

For the first subsection, the Government must prove "(1) 'fraudulent intent'; (2) 'a scheme or artifice to defraud'; and (3) 'a nexus with a security.'" *Hatfield*, 724 F. Supp. 2d at 324 (quoting *United States v. Mahaffy*, No. 05-cr-613, 2006 WL 2224518, at *12 (E.D.N.Y. Aug. 2, 2006)); *accord United States v. Motz*, 652 F. Supp. 2d. 284, 294 (E.D.N.Y. 2009).

For the second subsection, the Government must prove "(1) a scheme or artifice; (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property; while possessing (3) fraudulent intent." *Hatfield*, 724 F. Supp. 2d at 324 (internal quotation marks omitted). The Government must also prove a nexus with a security.

Finally, for both subsections, the Government must prove the "security" involved is "of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))." 18 U.S.C. § 1348. This is the language that forms the crux of Mr. Ramsey's present motion.

Mr. Ramsey makes two chief arguments. First, though he has since conceded this point, he argued initially that the word "security" in § 1348 does not include options. Second, he argues for a strict interpretation of § 1348, namely that the "of an issuer" language requires that the Government prove who issued the particular options. Because the Government did not introduce evidence as to who or what entity issued the Sapient or Oplink options, he argues, there is insufficient evidence for a jury to have convicted him.

The Government makes two chief arguments of its own. First, the Government argues that the word "security" includes options and, even if it does not, the "in connection with" language of § 1348 is broad enough to capture options. Second, the Government argues that the "of an issuer" language does not require what Mr. Ramsey argues. These arguments are both statutory interpretation and statutory construction arguments. Thus, the Court begins by interpreting § 1348.

## I.  Construction and Meaning of 18 U.S.C. § 1348

At the outset, the Court notes that there is scant caselaw construing § 1348 and that much of this opinion will be an issue of first impression. This, however, is simply a product of the practical reality; section 1348 was only enacted in 2002. Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 807, 116 Stat. 745, 804 (2002). As a result of its relatively recent vintage, few cases involving this statute have gone to trial and even fewer have been appealed. Those that have been appealed have not directly addressed the meaning of the terms at issue in this case. Instead, they have focused on the required elements of an offense under § 1348, the meaning of the "in connection with" language in § 1348, or the sufficiency of evidence in a particular case. To untangle this knot, the Court will construe and define the portions of § 1348 relevant to Mr. Ramsey's motion. To do so, the Court adheres to a few cardinal principles of statutory interpretation.

First, § 1348 is to be interpreted so as to give meaning to all of its parts. "If possible, [a court] must 'give effect to every clause and word of a statute' and be 'reluctant to treat statutory terms as surplusage.'" *Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

Second, the Court adheres to the text of § 1348, looking to the ordinary meaning of the words in the statute. *Vorcheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018). Courts "ordinarily assume, absent a clearly expressed legislative intention to the contrary, that the

16

legislative purpose is expressed by the ordinary meaning of the words used." *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019) (internal quotation marks omitted).

Third, under the reference canon, "a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments." *Jam*, 139 S. Ct. at 769. "Federal courts have often relied on the reference canon, explicitly or implicitly, to harmonize a statute with an external body of law that the statute refers to generally." *Id.*

The reference canon of statutory interpretation is especially appropriate with § 1348 for a few reasons. First, Congress drafted § 1348 against the backdrop of the Securities Exchange Act and the Commodities Exchange Act. *See United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021) ("It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law." (quoting *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019))). Reflecting its reliance on the Securities Exchange Act, § 1348 never defines "security," but the Securities Exchange Act does. 15 U.S.C. § 78c(a)(10). Second, numerous courts have recognized that Congress drafted § 1348 to be broader and less technical than the existing criminal prohibitions within the Securities Exchange Act. *See Motz*, 652 F. Supp. 2d at 294; *Mahaffy*, 2006 WL 2224518, at *12. The legislative history of § 1348 confirms this to be true.[5] *See* S. Rep. No. 107-146, at 20 (2002), *available at* 2002 WL 32054437; 148 Cong. Rec. S7418 (daily ed. July 26, 2002) (statement of Sen. Patrick Leahy), *available at* 2002 WL 1731002. And drafting § 1348 against the backdrop of the Securities Exchange Act, Congress accomplished its goal. For example, under § 1348, the Government may prove that a defendant acted under a less

---

[5] The Court engages with this limited legislative history in an effort to be thorough, though does so perspicaciously because delving into legislative history is risky business. "A court's job is to parse texts, not psychoanalyze lawmakers." *United States v. Safehouse*, 985 F.3d 225, 238 (3d Cir. 2021).

stringent *mens rea* standard. *Compare* 18 U.S.C. § 1348 ("knowingly"), *with e.g.*, Model Crim.

Jury Instr. 9th Cir. 15.47 (2020) and cmt. (discussing "willfully" as it used in 15 U.S.C. § 78ff(a)).

In addition, in contrast the securities fraud under the Securities Exchange Act, § 1348 eliminated

the requirement that the Government prove a tipper received a personal benefit when providing

insider information under the misappropriation theory of insider trading. *See United States v.*

*Blaszczak*, 947 F.3d 19, 35–37 (2d Cir. 2019), *vacated on other grounds*, 141 S. Ct. 1040 (2021);

*accord United States v. Ramsey*, __ F. Supp. 3d __, 2021 WL 4554631, at *2–4 (E.D. Pa. Oct. 4,

2021). In short, because Congress drafted § 1348 against the backdrop of, and with explicit

reference to, the Securities Exchange Act, the reference canon is appropriate here.

  With these principles in mind, the Court moves to defining the terms of § 1348 implicated

by Mr. Ramsey's motion.

    A. <u>"Security"</u>

  To start, the word "security" in § 1348 encompasses options under both the ordinary

meaning of the term and under the definition in the Securities Exchange Act. The ordinary meaning

of "security" includes options.[6] Black's Law Dictionary defines "security" as "[a]n instrument that

evidences the holder's ownership rights in a firm (e.g., a stock), the holder's creditor relationship

with a firm or government (e.g., a bond), or the holder's other rights (e.g., an option). . . A security

also includes any put, call, straddle, option, or privilege on a security. . . ." *Security* (def. 6), *Black's*

*Law Dictionary* (11th ed. 2019). Likewise, the Oxford English Dictionary defines "security" as

"Originally: a document held by a creditor as a guarantee of the right to payment, or attesting

ownership of property, stock, bonds, etc.; (hence) the financial asset represented by such a

---

[6] In his initial briefing before he conceded this point, Mr. Ramsey noted that his trading at issue in this case was being done in the "securities market." Doc. No. 151, at 2. This serves as further confirmation that the common, ordinary meaning of "security" is understood to include options as well.

document." *Security* (def. 5(e)) *Oxford English Dictionary* (3d ed. 2011). Both definitions plainly encompass options. Likewise, the Securities Exchange Act defines "security" to include options. In that Act, security "means. . . any put, call, straddle, option, or privilege on any security. . . or in general, any instrument commonly known as a 'security'. . . or any. . . right to. . .purchase, any of the foregoing." 15 U.S.C. § 78c(a)(10). Thus, the term "security" in § 1348 plainly encompasses options.

Mr. Ramsey argued, at least initially, however, that the word "security" did *not* include options. Mr. Ramsey's contended that had Congress wanted to include options on securities in § 1348, it would have done so explicitly. Indeed, he suggests, Congress did just that in another clause, where it differentiated between a "commodity" and an "option on a commodity." And Mr. Ramsey is right that § 1348, as originally enacted, did not contain the clauses encompassing commodities or options on commodities. Instead, it was amended in 2009 to include those terms. Pub. L. 111-21, § 2(e)(1), 123 Stat. 1617, 1618 (2009). This is because, while the Securities Exchange Act regulates securities, commodities and options on commodities are regulated separately under the Commodity Exchange Act, and also defined separately even within that Act. 7 U.S.C. §§ 1a(9) (commodity), 1a(36) (option).[7] Thus, it makes sense why Congress *did* separately include commodities and options on commodities in § 1348 but did *not* separately include securities and options on securities. In short, the structure of § 1348, considered in light of both the Securities Exchange Act and the Commodities Exchange Act, jettisons Mr. Ramsey's argument on this point.

Moreover, Mr. Ramsey argues based on legislative history that the word "security" in § 1348 as originally enacted did not include options. Doc. No. 156, at 8. Mr. Ramsey is right that

---

[7] And, notably, the Commodities Exchange Act does not anywhere define "security." *See* 7 U.S.C. § 1a.

the report of the Senate Judiciary Committee on the proposed 2009 amendment to § 1348 explained that the amendment would alter § 1348 "to include commodities fraud, in addition to securities fraud. Currently, the securities fraud statute does not reach frauds involving options or futures, which include some of the derivatives and other financial products that contributed substantially to the current financial collapse." S. Rep. No. 111-10, at 8 (2009), *as reprinted in* 2009 U.S.C.C.A.N. 430, 436. But this argument is not convincing.

First, the meaning of this statement is indeterminate. It could mean that § 1348 did not originally criminalize options at all or it could mean that § 1348 only did not criminalize options on commodities (the better reading in this Court's analysis).[8] Second, a single statement in a Senate report is not enough to overcome the plain text and statutory background of § 1348. Indeed, legislative history can be notoriously unreliable. *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("We are governed by laws, not by the intentions of legislators. . . [N]ot the least of the defects of legislative history is its indeterminacy. If one were to search for an interpretive technique that, *on the whole*, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history." (emphasis in original)). One piece of indeterminate legislative history alone does not require the Court to conclude that options on securities fall outside the scope of § 1348. Perhaps acknowledging the weakness of this legislative history, Mr. Ramsey has, in his most recent briefing, conceded that an option is a "security" within the meaning of that term as it is used in § 1348. Doc. No. 156, at 6.

---

[8] Notably, the header to this section is "Amending securities fraud statute to include *commodities* fraud." S. Rep. No. 111-10, at 8 (2009) (emphasis added).

In sum, the Court concludes that the word "security" in § 1348 includes options. Further, the Court concludes that the meaning of "security" in § 1348 is the same definition of "security" as it is defined in the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).[9]

### 1. "In connection with"

Attempting another statutory route to this same conclusion, the Government also argues that the "in connection with" language of § 1348 is broad enough to include options contracts within the statute. Section § 1348 makes it a crime to "(1) to defraud any person *in connection with* . . . any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))" or "(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property *in connection with* the purchase or sale of . . . any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))." 18 U.S.C. § 1348 (emphasis added). On an initial glance, the Government's argument seems to make sense. Options on stocks would not exist absent the underlying stock; as explained above, the very reason an option is called a "derivative" is because an option's price is *directly connected to* the value of the underlying asset. But the Government places far too much weight on those three small words. For, as other courts have explained, the phrase "in connection with" refers to a defendant's conduct with respect to the security, not the *type* of security at issue. It is, then, an action concept, not an adjective.

---

[9] The Court does not need to decide today whether § 1348 also incorporates portions of the Commodity Exchange Act through the reference canon, but it appears that Congress drafted the language of § 1348 so as to track the terms of art contained in both the Commodity Exchange Act *and* the Securities Exchange Act.

Although only a few cases have interpreted the "in connection with" language in the § 1348 context, both referred back to the Securities Exchange Act context to do so. *United States v. Hussain,* 972 F.3d 1138, 1147–48 (9th Cir. 2020); *Mahaffy*, 2006 WL2224518, at \*12. For example, the Ninth Circuit Court of Appeals in *Hussain* noted that fraud is "in connection with" a security when it involved "public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely." 972 F.3d at 1147 (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)). Likewise, the *Hussain* court pointed to cases holding that an audit report was "in connection with" securities and that a defendant causing another to make statements knowing they would reach investors to be "in connection with" securities. *Id.* (citing *McGann v. Ernst & Young,* 102 F.3d 390, 397 (9th Cir. 1996) and *SEC v. Wolfson,* 539 F.3d 1249, 161 (10th Cir. 2008)). Similarly, the *Mahaffy* court referred to *United States v. O'Hagan*, 521 U.S. 642, 652 (1997), in which the Supreme Court explained that the misappropriation theory of insider trading, in which an insider takes confidential information for the purpose of trading securities, is "in connection with" securities in the Securities Exchange Act context. 2006 WL 2224518, at \*12. As one district court cogently explained, in the Securities Exchange Act context, the "'in connection with' requirement mandates that the alleged fraud concern the fundamental nature of the securities: namely, characteristics and attributes that would induce investors to buy or sell the particular securities." *Ernst & Co. v. Marine Midland Bank, N.A.*, 920 F. Supp. 58, 61 (S.D.N.Y. 1996) (internal quotation marks omitted).

In short, any number of actions or statements might be "in connection with" a security under § 1348, construed against the meaning of the same language in the Securities Exchange Act context. Indeed, the press release in *Hussain* is a great example. *Hussain* also demonstrates why

22

the Court's rejection of the Government's broad reading will undoubtedly *not* read the "in connection with" language out of § 1348. But the Court is not aware of *any* case in the Securities Exchange Act context in which a court held that the "in connection with" language could expand the *type* of security criminalized under § 10(b). This Court declines to be the first.

> B. "Of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))"

Next, the Court must define the meaning of the phrase "of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))."

To begin, the meaning of "issuer" is substantially the same according to both the ordinary meaning of the term and the definition of the term in the Securities Exchange Act. Under an ordinary definition, an issuer is "[a] person or entity (such as a corporation or bank) that issues securities, negotiable instruments, or letters of credit." *Issuer* (def. 1), *Black's Law Dictionary* (11th ed. 2019). Confirming this, "issuer" is defined in the Securities Exchange Act to mean "any person who issues or proposes to issue any security." 15 U.S.C. § 78c(a)(8). Neither party contests this understanding.

From here, however, the two parties' arguments seriously diverge. Mr. Ramsey argues that § 1348 requires the Government to prove the "issuer" of the *options* implicated in this case. In other words, the issuer of the company's *stock* will not suffice. Because the Government introduced no evidence regarding who or what entity issued these particular options, he contends, there is insufficient evidence to convict him. Taking a different stance, the Government contends that the securities need only be "of" an "issuer," so that the option does not need to be issued *by*

an "issuer" with the registration requirements outlined in § 1348, so long as the option is for a security issued by a company meeting the registration or filing requirements specified in § 1348. The Government is right.

First, the word "of" is this context does not signify possession. Mr. Ramsey would read the "of" to mean that the option must come "*from*" the specific issuer of that specific option. But that is not the most natural reading of the phrase "of an issuer." Instead, the better reading of the phrase "of an issuer" is that it is a prepositional phrase attached to its object, "issuer," such that the option must be on a security that "comes … from" or "out of" a company with securities registered under the Securities Exchange Act. *Of* (def. I(1)(a)), *Oxford English Dictionary* (3d ed. 2004). Mr. Ramsey would stand on firmer ground if the statute said, "issued *by* an issuer." But that is not what § 1348 says, and the Court must read it according to its plain text.

Second, the definition of "security" from the Securities Exchange Act clearly supports this interpretation. Cutting the definition of "security" from the Securities Exchange Act and pasting it into § 1348, as the Court does under the reference canon, *Jam*, 139 S. Ct. at 769, Mr. Ramsey's argument collapses. Under the Securities Exchange Act, "security" includes "any put, call, straddle, option or privilege *on any security*." 15 U.S.C. § 78c(10) (emphasis added). Inserting this into the contested clause of § 1348 means that § 1348 reads "any 'put, call, straddle, option or privilege *on any security*' of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))." 18 U.S.C. § 1348; 15 U.S.C. § 78c(10).

This interpretation is in line with the context of the statute. Congress has limited power to pass criminal statutes. It often does so under its Commerce Clause powers in tandem with the

Necessary and Proper Clause. U.S. Const. art. I, § 8, cls. 3, 18. But that power is not without its limits. Congress can only regulate "channels of interstate commerce"; "instrumentalities," people, and "things in interstate commerce"; and "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995). That § 1348 only criminalizes fraud in securities "of an issuer" with a "class of securities" either "registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*)" or "that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d))" ensures Congress is criminalizing activity that affects interstate commerce. *See, e.g.*, 15 U.S.C. §78*l*(b) (noting registration procedure for listing on *national* securities exchanges); 15 U.S.C. §78*l*(g)(1) (requiring issuers "engaged in interstate commerce, or in a business affecting interstate commerce" that meet certain requirements to register); 15 U.S.C. §78*o*(a)(1) (requiring registration to make use "of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security"). Thus, the phrase is designed to ensure that § 1348 broadly criminalizes securities fraud in the national marketplace.

Therefore, the Court rejects Mr. Ramsey's argument and concludes that the security need only be "of" an issuer meeting the registration or filing requirements specified within § 1348.

## II.   Count Nine and Count Ten

Having now defined the terms required to resolve Mr. Ramsey's motion, the Court turns to the individual counts at issue, starting with Counts Nine and Ten. Count Nine charged Mr. Ramsey with securities fraud in violation of § 1348 as to Sapient Corporation and Count Ten charged the same as to Oplink Communications, LLC.

Applying the terms defined above, there is no dispute that the options were "securities" within the meaning of § 1348. They fit within the ordinary definition of "security," they fall within the definition of "security" in the Securities Exchange Act, and Mr. Ramsey conceded that they

were securities within the meaning of § 1348. There was sufficient evidence for a rational jury to have found the options of both companies to be securities. *See, e.g.*, Sep. 21, 2021 Tr. at 49:4–6; Sep. 23, 2021 Melley Tr. at 4:23–5:4.

Next, the options on both Sapient's stock and Oplink's stock were securities "of an issuer," with both companies either being registered under Section 12 of the Securities Exchange Act (15 U.S.C. § 78*l*) or required to file reports under Section 15(d) of the Securities Exchange Act (15 U.S.C. § 78*o*(d)), as is required under § 1348. There was ample evidence that both Sapient and Oplink stock were traded on the NASDAQ, a national exchange, and were registered with the Securities Exchange Commission.[10] *See, e.g.*, Sep. 21, 2021 Tr. at 34:24–35:4 (Sapient); *id.* at 36:2–9 (Oplink); Sep. 23, 2021 Melley Tr. at 13:8–18.

There is also a separate and additional reason to uphold Count Nine. The Government introduced evidence that Mr. Ramsey traded shares of Sapient Corporations *stock*, in addition to *options*. Gov. Ex. 2-3; Sep. 23, 2021 Melley Tr. at 13:8–9, 12–16, 44:10–12, 45:6–9, 45:18–22. The fact that Mr. Ramsey traded in the *stock* of Sapient, along with *options*, as opposed to *only* options means there is an additional basis for a rational jury to have convicted Mr. Ramsey for securities fraud in violation of § 1348 as to Sapient Corporation. In other words, even if the Court is wrong about its interpretation regarding the meaning of the term "of an issuer" within § 1348, Count Nine would be upheld even under Mr. Ramsey's interpretation of that phrase.

---

[10] While no witness specifically stated that either company was the "issuer" of its own stock, that is a fair inference from the testimony, given that a company "issues" its own stock. And while Mr. Ramsey may contend that the Government introduced no evidence that Sapient or Oplink specifically either registered under Section 12 of the Securities Exchange Act (15 U.S.C. § 78*l*) or was required to file reports under Section 15(d) of the Securities Exchange Act (15 U.S.C. § 78*o*(d)), there was ample evidence that the stock of both Sapient and Oplink were traded on national securities exchanges and were securities registered with the SEC. Plus, at this stage the Court must construe all of the evidence and all inferences in favor of the prosecution and in favor of the jury's verdict. *Wolfe*, 245 F.3d at 261; *Anderskow*, 88 F.3d at 251.

Therefore, the Court denies Mr. Ramsey's motion for judgment of acquittal as to both Counts Nine and Ten.

### III.    Count Six

Mr. Ramsey also argues that there was insufficient evidence in the record for a rational jury to have convicted him of conspiracy to commit securities fraud in violation of § 1349. His argument, however, does not withstand serious scrutiny.

Conspiracy is an inchoate crime, meaning that a person can be found guilty of conspiracy even without having completed the illegal object of that conspiracy. *United States v. Salahuddin*, 765 F.3d 329, 341 (3d Cir. 2014). Thus, even if there was insufficient evidence for a rational jury to have found Mr. Ramsey guilty of securities fraud under § 1348 (which there was not), it would have *no effect* on the jury's ability to find him guilty of conspiracy to commit securities fraud in violation of § 1349. *Id.* ("The goal of the conspiracy. . . need not be achieved for a conspiracy conviction."). Plus, § 1349 does not even require that the Government prove the existence of any overt act. *See, e.g.*, *United States v. Shabani*, 513 U.S. 10, 15 (1994); *United States v. Obaygbona*, 556 F. App'x 161, 164 (3d Cir. 2014); *United States v. Pistone*, 177 F.3d 957, 959–60 (11th Cir. 1999). Thus, Mr. Ramsey's argument fails.

### IV.    Mr. Ramsey's Other Arguments

Lastly, Mr. Ramsey advances two other theories as to why he should be acquitted. The Court briefly address them for the sake of being thorough.

First, Mr. Ramsey argues that because §§ 1348 and 1349 are both Title 18 fraud statutes, they require the Government to prove that, as with the mail and wire fraud statutes also housed in Title 18 of the United States Code, the object of the insider trading scheme was to deprive an identifiable victim of money or property. Mr. Ramsey argues that the insider trading scheme sought to deceive only Goldman Sachs, where Mr. Sonoiki worked, and the object of the scheme

was to make money in the securities market at large. Thus, he argues, there was no identifiable victim. Mr. Ramsey has styled this argument as a claim that there was insufficient evidence to convict him under §§ 1348 and 1349, but he is really claiming that § 1348 has an additional required element—an identifiable victim—and that because the Government did not prove that additional element, there was insufficient evidence to convict him.

Mr. Ramsey made this same argument in his pretrial motion to dismiss. Doc. No. 108. The Court already addressed and analyzed this argument in its opinion denying Mr. Ramsey's motion to dismiss and will not repeat it here.[11] *United States v. Ramsey*, No. 19-cr-268, 2021 WL 4244284 (E.D. Pa. Sep. 17, 2021). Indeed, Mr. Ramsey noted in present his motion that the Court had already addressed this identical argument. Doc. No. 151, at 2 n.1. As the Court explained at length, 18 U.S.C. § 1348, while undeniably under the wide umbrella of Title 18, is not the same statute as the mail and wire fraud statutes and, therefore, does not require that the Government prove the same elements as under those statutes.[12] *See Ramsey*, 2021 WL 4244284, at *4–6. Therefore, the Court rejects Mr. Ramsey's argument on this basis.

Second, Mr. Ramsey argues that there was insufficient evidence for a rational jury to have convicted him under § 1348(2) because "there was no evidence of a 'scheme...to obtain money or property by means of false or fraudulent pretenses, representations, or promises.'" Doc. No. 151, at 3. But this argument fails because, as detailed above, there was extensive evidence that Mr. Ramsey, Mr. Sonoiki, and Mr. Kendricks engaged in a scheme to obtain money through false or

---

[11] Another district court has also addressed this same argument about the requirement of an identifiable victim and rejected it. *See Mahaffy*, 2006 WL 2224518, at *12 ("[Section 1348(1)] does not restrict, or even contemplate, the status of the victim; rather, it simply requires that the government prove that the scheme to defraud was designed 'in connection' with a security.").

[12] The Court adds, as well, that in the Senate Judiciary Committee report, for what it's worth, Senator Leahy specifically differentiated § 1348 from the mail and wire fraud statutes and noted that the required elements are not, and were not intended to be, the same. S. Rep. No. 107-146, at 6 (2002), *available at* 2002 WL 32054437.

fraudulent pretenses: they used Mr. Sonoiki's insider information to buy options and stocks and the sold them once that confidential information was announced.

Therefore, neither of these arguments alters the Court's conclusion.

### CONCLUSION

For the foregoing reasons, the Court denies Mr. Ramsey's motion as to Counts Six, Nine and Ten. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE